[Civ. No. 13090. Second Dist., Div. One. Aug. 30, 1941.]

ALYCE J. HELMICK, Petitioner, v. INDUSTRIAL ACCI-
DENT COMMISSION et al., Respondents.

652

Allan L. Leonard for Petitioner.

Everett A. Corten and Eldon B. Spofford for Respondents.

WHITE, J.—This case comes before us on a writ of *certiorari* issued upon the application of petitioner, Alyce J. Helmick, to review an award made after rehearing by respondent Industrial Accident Commission in favor of respondent Safway Steel Scaffolds Company of California, a corporation (hereinafter referred to as "Scaffolds Company"), on the application of petitioner to the commission for additional benefits and an award of $2,500 by reason of alleged serious and willful misconduct charged against the respondent employer, and which conduct was claimed to have proximately contributed to the death of petitioner's husband in the course of his employment by respondent Scaffolds Company.

Petitioner herein is the surviving wife of Norris R. Helmick and was totally dependent upon him on June 23, 1939, at which time his earnings as employee of respondent Scaffolds Company were $38.35 per week. The sole question involved in the proceeding now before us is the liability of the employer for a penalty of an additional death award in the maximum sum of $2,500, based upon the aforesaid allegations of serious and willful misconduct. All normal benefits accruing to petitioner under the act were assumed and paid by the insurance carrier.

There is no serious conflict in the factual situation which forms the basis for this litigation. Mr. Helmick, the deceased, was employed as a rigger by respondent Scaffolds Company at Culver City, California. On June 23, 1939, he sustained injuries admittedly arising out of and in the course of his employment, and which injuries proximately resulted in his death on July 8, 1939. On the day of the accident the employer was engaged in putting up a diffusing truss unit, the same being defined as a special truss that goes over the top of a process screen for lighting purposes. There were two towers, each 20 feet in height, which had been completed and braced. They had a 5-by-7 foot brace. Between the tops of these towers there was being erected a pre-fabricated truss 35 feet in length, attached at each end to the towers, and being further supported by extension arms as well as vertical and horizontal cross bracing. At the time of the accident decedent was engaged in coupling up the cross bracing on the truss, and was on the second cross brace from one of

the towers. This coupling operation was performed by taking the wing nuts off the studs and replacing them after the cross brace was slipped off the stud by means of a hole cut in the brace. The truss was all pre-fabricated and cut to size, with holes cut in the cross braces so they could not slip on the bolts. Decedent was working at one end of the truss and another employee was at the other end. There were two wooden planks laid lengthwise across the tower cross bracing, near the top of such towers. There was no planking on the truss itself. At the hearing a witness stated that it was impossible to put such planking on the truss itself for the reason that the truss was so constructed that the cross bars would prevent the laying of a plank. The decedent stood part of the time on the wooden planking on the tower and part of the time on the steel tubing of the truss. Suddenly he slipped off this tubing, attempted to break his fall by grabbing a brace on the lower part of the truss unit, but was unsuccessful and fell to the ground. A finish coat of paint had been applied to the truss the day before, and there was testimony to the effect that it was thoroughly dry at the time of the accident and that the paint used dries in from three to four hours. In conflict with this there was testimony that there was fresh paint on the clothing of the decedent.

When petitioner's application for adjustment of her claim was filed, it came on for hearing before a referee of respondent commission with all parties represented. Following such hearing respondent commission, on June 11, 1940, made its findings and award in favor of the applicant, petitioner herein, and against the employer by reason of the serious and willful misconduct of such employer. Within the time allowed by law the employer filed a petition for rehearing and an application to transfer the proceedings to the San Francisco office of respondent commission. Under date of August 9, 1940, the commission made and served its order granting the employer's petition for rehearing and set the matter for further consideration at Los Angeles. On October 11, 1940, the ordered rehearing proceeded before the same referee who presided at the original hearing and the matter was again submitted. At the opening of the proceedings on rehearing the employer moved that the referee disqualify himself on the ground that he was prejudiced. This motion was denied. On October 14, 1940, the employer filed with the

commission a written "motion to set aside order of submission and request for further hearing." Respondent commission granted the last-mentioned motion and transferred such "further hearing" to a referee other than the one who had theretofore presided at all proceedings held on petitioner's application for adjustment of her claim; and at this last-named hearing additional testimony was taken. The referee last-named was furnished with a transcript of the testimony taken before his predecessor referee, and following the additional testimony offered at the hearing over which he presided, it was ordered that the matter be submitted. Thereafter the findings and recommendation of the last-named referee were adopted by the commission as its decision after rehearing. In such decision it was found that the employee's injury *was not* caused by the serious and willful misconduct of the employer, and accordingly it was ordered on March 10, 1941, that the applicant, petitioner herein, take nothing by reason of her claim of serious and willful misconduct.

■ Petitioner contends that respondent commission exceeded its jurisdiction when it granted a rehearing for the reason that such order was predicated merely upon a change of opinion on the part of the commission as to the correctness of its original position. Petitioner's arguments in support of her claim would be persuasive if the commission had, for instance, granted a rehearing on the sole ground that the employer had discovered new evidence, material to it, which it could not with reasonable diligence have discovered and produced at the original hearing, and then upon rehearing no such new evidence was produced, but nevertheless the commission changed its original award. (*Merritt-Chapman & Scott Corp.* v. *Industrial Acc. Comm.*, 6 Cal. (2d) 314, 323 [57 Pac. (2d) 501].) However, such is not the situation existing in the case now before us. Here the petition for rehearing was made upon several other grounds and not upon the ground of newly-discovered evidence. The petition for rehearing was grounded upon the claim that the evidence did not justify the findings of fact; and that the findings of fact did not support the order, decision and award. The petition for rehearing having been filed within the statutory time, the commission was vested with jurisdiction and it was its duty to grant a rehearing if in its opinion errors of law oc-

curred in the original hearing, or if in the opinion of the commission the findings of fact were unsupported by the evidence, or if in its opinion the award was unsupported by the findings. The reasoning contained in cases and decisions dealing with the right of the commission to reopen cases after the making of an award which has become final, either through failure to appeal from a rehearing or an adverse ruling thereon, and which right has been exercised under the 245-week continuing jurisdictional period, is not helpful in determining cases wherein the commission exercises its statutory right to pass upon a petition for rehearing regularly made following the award.

█ Petitioner next contends that respondent commission acted prejudicially to her rights when in the later stages of the proceedings, after rehearing granted, the case was transferred from one referee to another. Section 5310 of the Labor Code permits the commission to appoint one or more referees in any proceeding when in its opinion such a course seems necessary or advisable, and the same section further provides that matters arising out of the same proceeding may be referred to different referees. While prejudice would ensue should the commission hand down a decision through the instrumentality of a referee who had neither heard nor read all of the evidence in the case, such was not the situation with the instant case, where all of the evidence taken by the original referee was transcribed, submitted to and read by the referee who acted finally in the matter. Under such circumstances there was compliance with the legal mandate that "the one who decides must hear."

█ The commission having adopted the findings of and the decision recommended by the referee in the proceedings held after the granting of a rehearing, it was not required that the commission review the record. It is only when the commission disregards the findings and recommendation of its referee and makes different findings and award that a review of the evidence by the commission is required. (*Taylor* v. *Industrial Acc. Comm.*, 38 Cal. App. (2d) 75, 82 [100 Pac. (2d) 511] ; *Bethlehem Steel Co.* v. *Industrial Acc. Comm.*, 42 Cal. App. (2d) 192, 194 [108 Pac. (2d) 698].)

█ Finally, petitioner contends that the finding of respondent commission that the death of the deceased employee was not caused by serious and willful misconduct of the em-

ployer finds no substantial support in the evidence. 
At the outset it should be noted that, where any substantial
evidence is introduced in support thereof, the findings of the
commission are conclusive. (27 Cal. Jur. 582, and cases there
cited.) It is the law that the question of whether or
not the actions of the employer amounted to willful miscon-
duct, as that term is used in the act and as defined in *Great
Western Power Co.* v. *Pillsbury,* 170 Cal. 180, 186 [149 Pac.
35], is one of fact for determination by the commission. In
the case of *Cunningham Construction Co.* v. *Morgan,* 86 Ind.
App. 387 [156 N. E. 524], it was stated that "the question
(of willful misconduct) was one of fact for the Industrial
Board." It therefore follows that if the record con-
tains any substantial evidence upon which respondent com-
mission can predicate a finding that the conduct of the em-
ployer was not such that it would indicate that the employer
knew or ought to have known that it was likely to jeopardize
the safety of the employee, and if there is present in the
record substantial evidence that the conduct of the employer
was not such as would manifest a reckless disregard of the
safety of the employee and a willingness to inflict the fatal
injury of which complaint is made, then the finding and
award of the respondent commission against petitioner must
be upheld.

The following facts were in evidence. One witness stated
that the tower and truss structure was anchored to the
ground near a building on the moving picture lot, the wall
of the building being one or two feet from the nearest side of
the towers; that it was not anchored to the building; that no
safety lines or belts were used. This witness, after being
qualified, testified that in his opinion a man could not have
worked with a safety line because the cross braces would get
in the way of the line. This witness had been engaged in
the work of erecting tower and truss structures similar to
the one here in question since 1926, and during that time had
never used lifelines, nets or life belts on jobs similar to the
one with which we are here concerned. He testified that by
reason of his experience as a practical steel and scaffold
man he did not believe the job could have been handled in
any different way than it was handled; that there was noth-
ing to which lifelines could have been fastened, and further-
more, that the lines would foul while the man was crawling

through and tying in the truss. He did admit, however, that a lifeline could have been hung over the adjoining building and anchored on the other side of it. He testified, however, that if a net were strung under the truss and a man fell from the truss into the net before the truss was securely fastened to the tower, the impact would cause the towers to buckle and fall. Section 7106 of the Labor Code provides that nets or intermediate flooring must be provided only if the structure exceeds twenty-five feet. Admittedly, this one did not.

Another witness, who was a safety inspector for the accident commission, testified that in his capacity as such inspector he had never notified respondent Scaffolds Company that it was violating any safety order in the building of this particular scaffold or that the safety orders of the commission were applicable to rolling or moving scaffolds less than 25 feet in height. He further testified that in ten years' experience as a safety inspector for respondent commission he had never seen rope nets used on rolling scaffolds like the one here involved where the height was under 25 feet, nor had he ever seen a man use a safety belt or line while working on the construction or tying together a truss like the present one. It was testified that the practice and custom in the trade is the same as in building an oil well derrick, viz., the men do not wear belts or lines during the actual construction of the derrick because they are moving around continuously, but after the structure is completed and they go up on it to do work other than construction work they wear safety belts. The commission's safety inspector testified that he did not think it would be practicable to have fastened the truss to the towers with the whole structure on its side on the ground and then lift it to a vertical position; this because unusual stresses and strains would cause the structure to buckle. Another reason given in evidence as to why it would be impracticable to use a safety line in doing work of the nature that decedent was doing, was that he would have had to crawl or climb over the braces—they being too high to step over—and in so crawling or climbing he would have been more apt than ever to slip and fall. As to hand-holds, it was testified that the structure itself provided them, being composed of tubular members small enough to give a good hand-hold. It was stipulated at the hearing that another safety inspector, if

called as a witness, would testify substantially to the foregoing.

Another witness, who was director of safety for Lumbermen's Mutual Casualty Company at Los Angeles, and who was a graduate mechanical engineer, testified that his company insures all except three of the major studios; that in the course of his duties he inspects all equipment used by such studios once every two or three weeks and has been so engaged for over ten years. He testified that he was familiar with the type of structure built in this case, and upon which the deceased employee was working; that he had never seen a safety net used while tying the braces of such a structure; that the use of safety lines in such brace-tying operations would be impossible. He did admit that it would have been possible and practicable to swing a net underneath the truss; and as to whether a man falling in the net would cause the towers to buckle and collapse he could not testify without going into a mathematical computation as to stresses and strains. The president of respondent Scaffolds Company testified that he was the person who determined what safety precautions were to be taken in assembling and putting together the scaffolds which the company manufactured. In this matter he testified he was governed by a set of rules promulgated by the parent company in Milwaukee which manufactured the scaffolds; by the Industrial Accident Commission's rules; by inspectors of the company insurance carriers, and by certain union rules. He stated that he had never been informed by the Industrial Accident Commission or any of its inspectors or employees that safety nets or safety lines or belts should be used in the assembling of movable scaffolds which are less than 25 feet in height. He further testified that he had never been informed by the commission or any of its inspectors that any of the safety orders contained in the general construction safety orders were applicable to moving scaffolds less than 25 feet in height. He testified that he was familiar with the general custom and practice in the scaffold business; that it would not have been practical to have used a safety net under the truss in this case before all the braces had been tied; further, that it would have been impractical to use a safety line, since the men would have had to be continually taking it off and putting it on again to keep it from becoming fouled.

There was also testimony given by the grip superintendent at Columbia Studios, in which work he had been engaged for some sixteen years, that as a part of his work he was in charge of rigging and building sets, stages, etc. He testified he was familiar with the type of scaffold used by the employer herein. It was his opinion that nets could not be used before the trusses were put together and in use because it would interfere with the raising of the trusses; that belts and lines would not only slow the men up but would foul, due to the particular type of construction. Another witness, who was in charge of construction for a competitor of respondent employer, but which used the same type of product, testified that based on his years of experience he would say that lifelines, nets or scaffolds were not practicable in such construction work. He was of the same opinion as previous witnesses concerning the impracticability of tying the towers and trusses on the ground and then raising the whole structure, stating that this could not be done without placing a strain on the structure which could have a tendency to cause it to collapse. One of the safety inspectors for respondent commission testified that in his opinion the construction as practiced on this particular type of job was safe. He also testified that with reference to safety nets, the time involved in · erecting and placing such nets would exceed the time required to erect the scaffold; that it would take two or three men a half day to put up such a net. In this connection, a safety inspector for the commission testified that when considering the safety elements in a construction job the question of man hours must be considered; that the hours of labor and the number of men necessary for each installation must be considered; that if the man hours of labor are increased there is additional exposure to danger, and this must be measured against the man hours necessary to perform the original job; that if the man hours necessary to complete the labor of installing safety devices exceed a certain amount in comparison with the main job, then the so-called safety devices actually increase rather than decrease the accident exposure and hazard. This testimony was given in connection with the question naturally arising as to whether industrial hazards would be increased or diminished by the erection of the supposed safety devices. For example, if the building of a scaffold or net would take three men a half day, during which

time they are of necessity working in high places and exposed to the risk of falling while installing the safety device, and if the job which it is designed to protect is one where the height at which the men work is even less and is one which can be finished by two men in two or three hours, the theory of industrial hazards dictates that three men should not be exposed to greater hazard for a half day than the two men doing the main job are exposed to for a shorter time.

There was testimony given by qualified experts that the tower and truss scaffold herein was a safe place upon which to work, having in mind all of the factors surrounding the construction.

From the facts adduced in evidence, as hereinbefore set forth, to us it becomes clear that the respondent commission had before it at least substantial evidence to warrant it in reaching the conclusion that the injury resulting in the death of the employee was not occasioned by reason of the serious and willful misconduct of the employer. It follows, therefore, that the objection of petitioner herein with reference to such finding cannot be sustained. ██ The findings of the Industrial Accident Commission are subject to review only insofar as they have been made without any substantial evidence whatsoever in support thereof. The jurisdiction of an appellate court in cases of this character is limited strictly to determining whether there is evidence sufficient to sustain the award. ██ It is not our function to determine the credibility of the witnesses or the weight to be attached to their testimony. With this subject we have nothing to do because the commission is the final arbiter on questions of fact. Whatever our views may be upon the subject is of no consequence, as we are without power to disturb the findings of the commission when supported by evidence; and its conclusion upon a question of fact founded upon conflicting evidence is final.

For the foregoing reasons the award is affirmed.

York, P. J., and Doran, J., concurred.