[Civ. No. 37826. Second Dist., Div. Five. Oct. 27, 1971.]

SAMUEL C. BROWN, Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD and
SUBSEQUENT INJURIES FUND, Respondents.

**COUNSEL**

Ghitterman, Spielman & Steele, Spielman, Steele & Urias and Sumner J. Spielman for Petitioner.

Rupert A. Pedrin, Gabriel L. Sipos, Lionel K. Hvolboll, Evelle J. Younger, Attorney General, and Jerold A. Prod, Deputy Attorney General, for Respondents.

## OPINION

**AISO, J.**—Petitioner Samuel C. Brown, born August 26, 1907, filed for adjudication of his claim on December 28, 1967. He named Cal-Pat Growers, Inc. and San Joaquin Cotton Oil Co. as employers and State Compensation Insurance Fund and the Hartford Insurance Group as the respective insurers. He claimed that he had suffered chest (internal) injuries due to exposure to cotton dust while working as a cotton gin foreman from August 15, 1952 to October 10, 1966.

His claim was eventually expanded to include claims against the following employers and insurers for the periods of employment set forth below:

| Employer | Period | Insurer |
|---|---|---|
| Agricultural Products, Inc. | August 15, 1952, to July 1, 1959 | State Compensation Insurance Fund |
| San Joaquin Cotton Oil Co. | September to November 1962 | Ranger Insurance Co. |
| Holtville Cotton Products, Inc. | One week— quarter ending December 31, 1962 | Industrial Indemnity Insurance Co. |
| Cal-Pat Growers, Inc. | April 1, 1963, to October 10, 1966 | State Compensation Insurance Fund |

There were numerous other employers for whom no insurance carriers were named or against whom petitioner (hereafter Brown) did not allege exposure to cotton gin dust. The claims against the aforementioned four employers and their respective insurers were settled for a total sum of $9,500 by way of compromise and release, which was approved by the referee on January 20, 1969.

Brown applied for Subsequent Injuries Fund (hereafter Fund) benefits on October 9, 1968.[1] Over objection by the Fund that there was

---

[1] In this application, Brown alleged: He sustained injury to his chest on or about October 10, 1966, as the result of work activities from 1952 through October 1966 while employed as a cotton gin foreman for Cal-Pat Growers, Inc., San Joaquin Cotton Oil Co., and Holtville Cotton Products, Inc., which disabled him at least 80 percent, without adjustment for age and occupation. Prior to 1952, he was suffering from

no evidence of any disability, only pathology, prior to the date of the industrial exposure claimed, the referee asked and received a rating on the basis of "Pulmonary emphysema classified as severe of which 50% is due to industrial injury herein, and 50% is due to cigarette smoking over a period of many years." The permanent disability rating specialist found the pulmonary impairment of 75 percent based solely on the instructions from the referee and without reference to any medical reports. After the Fund's motion to strike the rating, Brown filed an amended application for Fund benefits.[2] In his supplemental findings and award, the referee found: Brown sustained an injury resulting in permanent disability to his lungs while employed between August 15, 1952, and October 10, 1966. The injury caused a permanent disability of 40½ percent after apportionment. Brown "had previous permanent disability of his lungs." The percentage of permanent combined disabilities is 81 percent. The award included lifetime payments by the Fund to Brown commencing the 163d week after October 10, 1966.

The Fund petitioned for reconsideration alleging that the liability imposed upon it was contrary to Labor Code sections 4750 and 4751 and that there was no basis to support the apportionment of disability. The referee recommended against reconsideration. The Workmen's Compensation Appeals Board (hereafter WCAB) granted the petition for reconsideration. The order reflects it did so to reexamine the evidence and law applicable to the proceeding and it vacated the referee's findings and award for that purpose. The WCAB then ordered an examination and report by Dr. Samuel J. Sills, M.D., as an independent medical examiner. His report was filed August 5, 1970. After Dr. Sills was examined at a supplemental hearing, the WCAB found, as the referee did, as to Brown's age, period of employment, and injury on October 10, 1966, while employed which resulted in permanent disability to his lungs. But the WCAB, inter alia, found "Applicant did not have previous ratable permanent disability" and limited its award against the Fund to reimbursement of medical-legal costs of $124.08.

In denying Brown's petition for reconsideration on December 18, 1970, the WCAB stated in part: "The basis for the Finding that applicant did not have prior ratable permanent disability is fully set forth in the Opinion accompanying the Decision After Reconsideration of November 12, 1970. As noted . . . , we are satisfied that all of applicant's present disability is due to his employment and did not arise separately from his occupation." Brown seeks a review of the WCAB's decision after reconsideration.

---

a preexisting partial permanent disability to his lungs to the extent of 20 percent. Total combined disability is 100 percent.

[2]He amended the penultimate sentence of his previous application to read: "That prior to October 10, 1966, applicant was suffering from a preexisting partial permanent disability to his lungs to the extent of 20 percent."

### Issues Raised

1. Did the WCAB err in granting the Fund's petition for reconsideration?

2. Was the finding by the WCAB that Brown did not have a previous ratable permanent injury on October 10, 1966, warranted?

We have concluded that the first question should be answered in the negative and the second one in the affirmative for the reasons set forth below.

### Grant of Reconsideration Proper

■ Brown contends that the WCAB was without jurisdiction to grant the rehearing, citing *Michon* v. *Workmen's Comp. App. Bd.* (1971) 15 Cal.App.3d 917 [93 Cal.Rptr. 476]. We think *Michon* should be confined to the facts of that case. In *Michon* the only medical testimony received was in favor of the claimant and neither the employer nor its carrier registered any disagreement with the doctor's report. They produced no evidence of their own, medical or otherwise. The petition for reconsideration was filed nine months after the report and five months after submission of the cause, supported by only a conclusionary statement of grounds. Here, the evidence consisting of the reports of Dr. Alan Frank, Dr. David C. Fainer, and Dr. William Oliver was in conflict. (Cf. *Franklin* v. *Workmen's Comp. Appeals Bd.* (1971) 18 Cal.App.3d 682, 685 [96 Cal.Rptr. 201].) The question of whether injury forming an integral part of a cumulative occupational disease, as presented in this case, could as a matter of law be the basis of a separate preexisting permanent partial disability within the meaning of Labor Code section 4751 was hotly mooted. Our situation is closer to that in *Helmick* v. *Industrial Acc. Com.* (1941) 46 Cal.App.2d 651 [116 P.2d 658], wherein the court stated at pages 655-656: "[I]t was [the commission's] duty to grant a rehearing if in its opinion errors of law occurred in the original hearing, or if in the opinion of the commission the findings of fact were unsupported by the evidence, or if in its opinion the award was unsupported by the findings."

### No Recovery Under Labor Code Section 4751 Established[3]

■ Brown's pertinent work history, as gathered from his statement in evidence and his statements given to the various examining doctors, ap-

---

[3]Provisions of Labor Code section 5303 (effective January 1, 1969) are deemed inapplicable since the injuries claimed antedate that date. (See *State Comp. Ins. Fund* v. *Workmen's Comp. App. Bd.* (1969) 1 Cal.App.3d 812, 819-820 [82 Cal.Rptr. 102]; *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388, 395-396 [182 P.2d 159].)

pears generally in accord with that reflected by his claims against various employers and insurers set forth earlier. It does appear, however, that Brown's first exposure to the cotton ginning industry commenced in 1951 (not 1952) while working for the Steaven H. Sturges Co. in Yuma, Arizona. During the period 1960 to April 1, 1963, he worked in Arizona and California (except from September 1962 to November 1962 when he worked for the San Joaquin Oil Co.) as a packer of cantaloupes, a millwright, and a ranch foreman. He engaged in baling Bermuda grass straw in the fall of 1960.

The work of cotton ginning is very dusty and the mills in which Brown worked were poorly ventilated. During the period he worked for Cal-Pat Growers, Inc. (April 1, 1963, to October 10, 1966), the ginning season ran from around mid-November to March of the following year. He did maintenance work in the mill for the balance of the year, thus working the year around. The maintenance work included blowing out of machinery in which "much 'gin-fall' " surrounded him. During the ginning season, he managed the cotton gins, oversaw the crews, and was responsible for the operational function and repair of the gins. It involved being in a "lot of gin-fall" and air full of cotton dust and various insecticides in it. He worked from 13 to 16 hours per day 7 days per week during the ginning season and 40 hours per week during the off-season period.

In the spring of 1964, during the latter part of the ginning season or just after it, he experienced "shortness of breath" and went to see Dr. N. K. Caldwell of Calipatria, who sent him to the Pioneers Memorial Hospital in Brawley. The first X-rays taken were interpreted May 1, 1964, as being compatible with asthmatic bronchitis. On May 22, 1964, upon reexamination, the pulmonary markings were considered within range of normal and except for secondary evidence of a mild pulmonary emphysema, the chest was otherwise unremarkable.

On going to Pioneers Hospital he was given, according to Brown, the Bird Respiratory Treatment (forced feeding of oxygen) for a period of 70 to 75 days as an outpatient. Except for his time off for treatment, he continued working the year around. However, he began having difficulty in breathing again in the spring of 1966 and Dr. Caldwell treated him with some shots.

The examining doctors unanimously agreed that Brown's disability was attributable, at least in part, to his lung ailment caused, at least in part, to his exposure when working in the cotton gin mills.[4] The Fund does

---

[4]Dr. David C. Fainer, who examined Brown on November 27, 1967, and Dr. William F. Oliver, who examined Brown on November 27, 1968, agreed that Brown was

not dispute that on October 10, 1966, Brown was a very sick man when he left his job. Nor does it dispute that Brown is totally and permanently disabled for workmen's compensation purposes.[5] Brown also impliedly concedes that on the date of his permanent injury, he was also suffering from other nonindustrially caused ailments, e.g., cirrhosis of the liver, peripheral neuritis, hypercholesterolemia, and hyperuricemia; and that his cigarette smoking over the years also contributed to his pulmonary pathology. But he contends that the record shows that he was labor-disabled prior to October 10, 1966, and therefore has made out a case entitling him to compensation from the Fund. The Fund counters contending that (1) a disabling condition that is a component part of cumulative injury cannot legally constitute a separate prior permanent partial disablement under Labor Code section 4751,[6] and (2) the evidence sustains the finding of the WCAB that Brown did not have a previous ratable disability and that all of his disability is due to his employment.

To avoid repetition, the statements of defendant and the opinion of the doctors relative to the issues will be related in course of discussing the points raised.

We are aware that workmen's compensation laws should be liberally construed with the purpose of protecting persons injured in the course of their employment. (§ 3202; *Zemke* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 801 [69 Cal.Rptr. 88, 441 P.2d 928]; *Jones* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 476, 480 [67 Cal.Rptr. 544, 439 P.2d 648].) However, this injunction does not, in our opinion, permit

---

suffering from byssinosis. (According to Dorland's Medical Dictionary (23d ed. 1961): "A form of pneumoconiosis due to the inhalation of cotton dust in factories." Pneumoconiosis: "A chronic fibrous reaction in the lungs to the inhalation of dust.") Dr. Alan Frank, who examined Brown on January 18, 1968, opined that Brown had a chronic lung ailment basically due to chronic irritation from organic dust encountered in course of employment as a gin mill operator and a secondary infection of his bronchial tree, which he diagnosed as pulmonary fibrosis and emphysema. (Dr. Oliver disagreed that pulmonary fibrosis could be caused by byssinosis, but see *Habovick* v. *Curtiss-Wright Corp.* (1965) 207 Pa.Super. 80 [215 A.2d 389] cited later on.) Dr. Sills who examined Brown on June 12, 1970, stated that Brown had been exposed for many years to cotton ginning which can cause byssinosis, and that Brown developed more severe symptoms due to chronic bronchitis, and pulmonary emphysema from his exposure to cotton ginning.

[5]Dr. Caldwell noted on July 20, 1967, that Brown "will probably be unable to work again." Dr. Fainer stated: "His present pulmonary disease is irreversible. The only treatment possible is to prevent progression of the disease." Dr. Frank concluded his report: "If [Brown] were to be employed at all he would be capable of doing only sedentary work. He should certainly avoid work in the future that exposes him to smoke, fumes and dust." Dr. Sills reported that Brown was permanently and totally disabled from an occupational standpoint.

[6]References hereafter to code sections refer to the Labor Code unless otherwise noted.

the claimant to waive by compromise settlement his legitimate right to any compensation recoverable from his employers and then shift the onus of the portion waived from industry to the taxpayers, since this results in double recovery for the same injury. (Cf. *Raischell & Cottrell, Inc.* v. *Workmen's Comp. App. Bd.* (1967) 249 Cal.App.2d 991, 997 [58 Cal. Rptr. 159].) The legislative intent is to prevent resort to the Fund which will result in double recovery for the same injury (§ 4753; *Subsequent Injuries Fund* v. *Industrial Acc. Com.* (1963) 217 Cal.App.2d 322, 327-328 [31 Cal.Rptr. 508]) or which will result in effecting health insurance as contrasted to workmen's compensation (*Ferguson* v. *Industrial Acc. Com.* (1958) 50 Cal.2d 469, 476 [326 P.2d 145]; *Subsequent Injuries Fund* v. *Industrial Acc. Com.*, *supra*, at p. 332). If the compromise and settlement were for a sum too low because of mistake, the remedy should be sought by having it set aside (cf. *Raischell & Cottrell, Inc.* v. *Workmen's Comp. App. Bd.*, *supra*), not by resort to the Fund.

We first note that the injury Brown suffered was an occupational disease. Drs. Fainer and Oliver were of the opinion that Brown was suffering from byssinosis, which Dr. Fainer explained to be an occupational lung disease. The statements which Brown made to the various examining physicians[7] were consistent with the characteristics of an occupational disease as gathered from California decisions.[8]

---

[7]To Dr. Caldwell, who examined Brown on July 20, 1967, for the doctor's first report of work injury, Brown stated that during 1952 to 1960 and 1963 to 1966 when he worked in the cotton gin mills, he developed *gradually* extreme shortness of breath, wheezing, and chest pains, to the extent that he could no longer work, giving October 10, 1966, as the date of his injury. He told Dr. Milan L. Brandon, whose report is in Dr. Caldwell's medical records, that he was told about 10 years prior to May 31, 1967, that he had "emphysema." "During this time he has had increasing shortness of breath, wheezing, and chest tightness with exertion, most marked the past year [1966]." He told Dr. Fainer on November 11, 1967, that he had been told he had had emphysema from about 1962, but it did not bother him much. By 1965, he had become very short of breath and was given intermittent positive pressure breathing which gave him temporary relief. He had no adverse symptoms during the early years of his work in the gin mills. He noted in 1964, during the ginning season, a shortness of breath, coughing, and wheezing. When the ginning season was over, he improved. Between ginning seasons (lasting four months), he had much less shortness of breath, coughing, and wheezing. The "same sequence of events" transpired during the 1965 and 1966 ginning seasons. He had pneumonia 2 or 3 times in childhood. He started smoking at age 15 and has smoked ever since. He has smoked up to 3 packages per day, and still smokes 1 package a day (although several physicians have advised him to stop). He disclaimed allergy, but he sneezed when around certain pollens. He did not have asthma in childhood. He told Dr. Sills that he was in good health until April 1966. He had uneventful recoveries from his childhood pneumonias.

[8]Among the judicially determined characteristics are: "(1) gradual development although the rate of progress may vary; (2) usually a continual absorption of deleterious substances; (3) continuous exposure to a particular work situation finally

In *Argonaut Ins. Co.* v. *Industrial Acc. Com.* (1964) 231 Cal.App.2d 111, 119 [41 Cal.Rptr. 628], the court stated: "[T]here is a great similarity between occupational disease cases and other continuous or cumulative type injury cases. [¶] In either case the workman's ultimate disability is due to continuous exposure at work . . . which finally causes his physical breakdown. Moreover, in each case there is no compensable injury until the disability occurs." (See also *Fruehauf Corp.* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 569, 573 [68 Cal.Rptr. 164, 440 P.2d 236]; *Colonial Ins. Co.* v. *Industrial Acc. Com.* (1946) 29 Cal.2d 79, 83-84 [172 P.2d 884]; *Marsh* v. *Industrial Acc. Com.* (1933) 217 Cal. 338, 344-345 [18 P.2d 933, 86 A.L.R. 563].)

Moreover, it has been held that industry-aggravated emphysema with preexisting nondisabling silicosis and secondary emphysema is an occupational disease for which the employer is liable for 100 percent of the employee's disability. (*U.S. Lime Products* v. *American Mutual Liab. Ins. Co.,* 29 Cal.Comp.Cases 254 (writ den. by Court of Appeal, 1964); for holdings permitting recovery for industry-aggravated emphysema, see *Cal. Casualty Indem. Exch.* v. *Ind. Acc. Com.,* 31 Cal.Comp.Cases 135 (writ den. by Court of Appeal, 1966); *Masonite Corp.* v. *Ind. Acc. Com.,* 30 Cal. Comp.Cases 88 (writ den. by Court of Appeal, 1965).) In *Habovick* v. *Curtiss-Wright Corp., supra,* 207 Pa.Super. 80, 83-84 [215 A.2d 389, 390-391], pulmonary fibrosis accompanied by pulmonary emphysema resulting from inhaling Polyethyl Ether on the job was held to be an occupational disease.

In occupational disease cases, the claimant has been given the special statutory right of proceeding against any employer by whom he has been employed for the full amount of his disability and thereby shifting to the employer held liable or his insurer the burden of contribution or apportionment among employers. (§ 5500.5; *Baker* v. *Industrial Acc. Com.* (1966) 243 Cal.App.2d 380, 382 [52 Cal.Rptr. 276]; *U.S. Lime Products* v. *American Mutual Liab. Ins. Co., supra,* 29 Cal.Comp.Cases 254, 255-256; *Colonial Ins. Co.* v. *Industrial Acc. Com., supra,* 29 Cal.2d 79, 82.) Why Brown waived this advantage is not satisfactorily explained. The compromise and release states in part that: "The parties have agreed to settle this claim because there are bona fide and serious disputes between said parties as to the nature, extent and duration and cause of applicant's

---

causing physical breakdown; (4) disease not previously existing but building up over a period of time; (5) natural and reasonably to be expected results of following a particular occupation for a considerable period of time; (6) first and early stages not always perceptible; (7) peculiarity to a given occupation; (8) latency and progressive development." (Swezey, *Disease as Industrial Injury in California* (1967) 7 Santa Clara Law. 205, 209 [fns. omitted]. See also *Johnson* v. *Industrial Acc. Com.* (1958) 157 Cal.App.2d 838, 840, et seq. [321 P.2d 856].)

disability, if any, and as to the proximate cause of said disability and to the exposure of each carrier, insofar as its liability is concerned." Section 5500.5 legislatively relieves the claimant of most of these burdens. *Chambers* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 556, 561-562 [72 Cal.Rptr. 651, 446 P.2d 531], held that apportionment of industry-caused emphysema could not be made without medical testimony that cigarette smoking was a causative factor. To permit a recovery without a satisfactory explanation in this regard would result in double recovery for the same injury (cf. *Raischell & Cottrell, Inc.* v. *Workmen's Comp. App. Bd., supra,* 249 Cal.App.2d 991, 997), except that the onus is shifted to the taxpayers.

The applicability of the normal rules of apportionment such as that provided for in section 4663 to instances of occupational diseases has been questioned because of the rule first enunciated in *Colonial Ins. Co.* v. *Industrial Acc. Com., supra,* 29 Cal.2d 79 and now codified in Labor Code section 5500.5. (*State of Cal.* v. *Industrial Acc. Com.* (1955) 135 Cal.App.2d 544, 549-550 [288 P.2d 31].)[9] But assuming that recovery may be had without resort to the occupational disease theory, Brown has not made out a case to hold the Fund liable under section 4751.[10] Section 4750[11] must be construed in light of the rule that acceleration,

---

[9]Opinion by Justice Bray, concurred in by then Presiding Justice Peters; overruled on requirement of knowledge of preexisting disability on part of employer (*Ferguson* v. *Industrial Acc. Com., supra,* 50 Cal.2d 469, 478) and on part of employee (*Subsequent Injuries Fund* v. *Industrial Acc. Com.* (1961) 56 Cal.2d 842, 846 [17 Cal.Rptr. 144, 366 P.2d 496]).

[10]Section 4751: "If an employee who is permanently partially disabled receives a subsequent compensable injury resulting in additional permanent partial disability so that the degree of disability caused by the combination of both disabilities is greater than that which would have resulted from the subsequent injury alone, and the combined effect of the last injury and the previous disability or impairment is a permanent disability equal to 70 percent or more of total, he shall be paid in addition to the compensation due under this code for the permanent partial disability caused by the last injury compensation for the remainder of the combined permanent disability existing after the last injury as provided in this article; provided, that either (a) the previous disability or impairment affected a hand, an arm, a foot, a leg, or an eye, and the permanent disability resulting from the subsequent injury affects the opposite and corresponding member, and such latter permanent disability, when considered alone and without regard to, or adjustment for, the occupation or age of the employee, is equal to 5 percent or more of total, or (b) the permanent disability resulting from the subsequent injury, when considered alone and without regard to or adjustment for the occupation or the age of the employee, is equal to 35 percent or more of total."

[11]Section 4750: "An employee who is suffering from a previous permanent disability or physical impairment and sustains permanent injury thereafter shall not receive from the employer compensation for the later injury in excess of the compensation allowed for such injury when considered by itself and not in conjunction with or in relation to the previous disability or impairment. [¶] The employer shall

aggravation, or "lighting up" of a preexisting nondisabling condition is an injury in the employment causing it and if the resultant disability is entirely due to the industrial injury "lighting up" the previous dormant condition, then the employer is liable for that disability and there can be no apportionment. ■ Whether the disability results in whole or in part from the *normal progress* of a preexisting disease or represents a fully compensable lighting up or aggravation of a preexisting condition is a factual issue for the WCAB to determine and its award will not be annulled if there is substantial evidence to support it. (*Reynolds Elec. etc. Co.* v. *Workmen's Comp. App. Bd.* (1966) 65 Cal.2d 438, 442-443 [55 Cal.Rptr. 254, 421 P.2d 102].) ■ Unless substantial evidence supports an apportionment to a preexisting disease, the employer is liable for the whole of the disability. (*Berry* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 786, 789 [69 Cal.Rptr. 68, 441 P.2d 908]; *Zemke* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 799-800 [69 Cal. Rptr. 88, 441 P.2d 928]; see *Dow Chemical Co.* v. *Workmen's Comp. App. Bd.* (1967) 67 Cal.2d 483, 495 [62 Cal.Rptr. 757, 432 P.2d 365].)

■ Moreover, it is not every case where an employer avoids liability under section 4750 that the claimant may recover from the Fund. He must bring himself within the requirements of section 4751. (*Dow Chemical Co.* v. *Workmen's Comp. App. Bd., supra,* at p. 494.) While the permanent partial disability need not have existed prior to work exposure (*Dow Chemical Co.* v. *Workmen's Comp. App. Bd., supra,* fn. 9 at p. 495) nor need it be of industrial origin, known to the claimant at the time of the subsequent injury, or the subject of a prior rating (*Subsequent Injuries Fund* v. *Workmen's Comp. App. Bd.* (1970) 2 Cal.3d 56, 62 [84 Cal.Rptr. 140, 465 P.2d 28]), or known to the employer (*Ferguson* v. *Industrial Acc. Com., supra,* 50 Cal.2d 469, 470), nevertheless it must antedate the subsequent injury (*Subsequent Injuries Fund* v. *Industrial Acc. Com.* (1964) 226 Cal.App.2d 136, 145 [37 Cal.Rptr. 844]) and it must be permanent in character (*Dow Chemical Co.* v. *Workmen's Comp. App. Bd., supra,* 67 Cal.2d 483, 492; *Subsequent Injuries Fund* v. *Industrial Acc. Com., supra,* 226 Cal.App.2d 136, 143-144). Although the prior disability need not be reflected in the form of loss of earnings, if it is not, it must be of a kind upon which an award for partial permanent disability could be made had it been industry caused. This is necessary to distinguish if from a "lighting up," aggravation, or acceleration of a preexisting physical condition where the employer is to be held liable for the whole. (*Ferguson*

not be liable for compensation to such an employee for the combined disability, but only for that portion due to the later injury as though no prior disability or impairment had existed."

v. *Industrial Acc. Com., supra,* 50 Cal.2d 469, 477-478; *Subsequent Injuries Fund* v. *Industrial Acc. Com., supra,* 56 Cal.2d 842, 845.)

"[T]o apply the provision for preexisting permanent partial disability to more than easily recognizable permanent objective disabilities would convert the Subsequent Injuries Law into a state health insurance plan" (*Ferguson* v. *Industrial Acc. Com., supra,* 50 Cal.2d 469, 476) which would be contrary to the legislative intent.

The burden of proof is on the one seeking the benefit of the Fund to prove that he meets the requirements of section 4751. (*Ferguson* v. *Industrial Acc. Com., supra,* 50 Cal.2d 469, 479; § 5705; cf. *Hercules P. Co.* v. *Industrial Acc. Com.* (1933) 131 Cal.App. 587, 593 [21 P.2d 1014].) ▮ Brown has not shown that the injury he claims as a previous permanent partial disability is not a nonspecific composite of the cumulative injury for which he sought compensation. To permit the use of the very same injury to recover from two sources under the workmen's compensation acts, the employer and the Fund, would result in a double recovery which must be avoided. (§ 4753; *Subsequent Injuries Fund* v. *Industrial Acc. Com., supra,* 217 Cal.App.2d 322, 327-328.) Furthermore, whether disability is due entirely to the injury, including the aggravating effect of the injury upon a preexisting condition, or due in whole or part to a normal progress of a preexisting disease, is a question of fact which must be based upon medical evidence, but the finding of the WCAB on it will not be disturbed if there is substantial evidence to support it. (*Southern Cal. Edison Co.* v. *Ind. Acc. Com.* (1965) 238 Cal.App. 2d 567, 570 [48 Cal.Rptr. 46]; *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 635-637 [83 Cal.Rptr. 208, 463 P.2d 432]; and see *Zemke* v. *Workmen's Comp. App. Bd., supra,* 68 Cal.2d 794, 796, 798.)

There is nothing in the record to show that there was any unusual and sudden dosage in the amount of cotton dust or cotton fill at any specific time. (See 1A Larson, Workmen's Compensation Law (1967) § 41.31, pp. 622.111-622.113.)

We have examined the reports of Drs. Fainer, Frank, Oliver, and Brandon but none of them actually addressed themselves to the question in issue here, namely, did Brown have a permanent partial disability prior to October 10, 1966, which would support an independent award if it had been work related and caused. Consequently, their opinions are not germane; reliance thereon may not be had. (*LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d 627, 630, fn. 2; *Berry* v. *Workmen's Comp. App. Bd., supra,* 68 Cal.2d 786, 792; *Jones* v. *Workmen's Comp. App. Bd., supra,* 68 Cal.2d 476, 480.)

On the other hand, Dr. Sills did address himself to the problem before us. He reported that he could not apportion what percentage of Brown's disability was due to preexisting bronchitis and what percentage was attributable to chronic bronchitis and emphysema due to gin mill exposure.[12]

Brown's counsel picks out certain statements of Dr. Sills, the independent medical examiner, in his testimony at the supplemental hearing held on September 30, 1970, and contends that these statements make it abundantly clear that Dr. Sills did not know the meaning of "disability" and "permanent disability" as used in workmen's compensation cases. These are: "Q. [By Brown's counsel] . . . Do you believe that this man was physically disabled prior to October 1966? A. If you use the term 'physically disabled' in terms of his medical findings, I would have to say yes. If you are using it in the terms of occupational, he was not disabled until he had to stop working. Q. I see the record indicates that apparently you have recorded it as early—well, sometime in 1964 he had such a marked shortness of breath that he obviously had to be placed—I don't know what kind—inhalation therapy of some kind. Is that not in your mind an evidence of a physical disability, the shortness of breath requiring this type of treatment? A. Yes, it is a medical physical disability. . . . Q. . . . . These factors, this problem, this physical problem, that you described as neuropathy also pre-existed 1966, did it not? A. I think so. . . . Q. Would the neuropathy and the shortness of breath which apparently is part of the whole chest syndrome then being a partial disability in your mind, would they reduce his ability to function as well as the normal man would even though he was working? A. Yes."

---

[12]"I know the problem facing the Commission and the Industrial Workmen's Appeals Board. An attempt is being made to assign how much of the patient's disability is due to pre-existing non-industrial causes, and how much is due to his industrial exposure. We are dealing here with the old cliche, 'Which came first, the chicken or the egg.' We know that this patient's smoking was a contributory factor to the disability. We know, according to Dr. Caldwell's history, that the patient had already had a history of shortness of breath and a diagnosis of emphysema made in 1957. We note that Dr. Worthman made the diagnosis of polycythemia in 1966 and began to do phlebotomies. It is my opinion that we cannot separate this patient's disability and assign 'X' per cent to his chronic bronchitis, preexisting, and 'X' per cent to his chronic bronchitis and emphysema due to the gin mill exposure. This patient might have developed disability even if he had not had the extra trauma resulting from his dust exposure in the gin mills. The patient was a heavy smoker and drinker, apparently. Both of these are contributory factors to pulmonary emphysema (chronic obstructive lung disease) and chronic bronchitis. From all the histories I have reviewed and the patient's own history, it appears that he did not begin to suffer until approximately 1957 and he began to have marked shortness of breath from 1964 until the time he was declared disabled in October, 1966. I, therefore, feel that the entire disability of this patient must be attributed to his occupational exposure; that his pre-occupational smoking and drinking habits did contribute but were not a major factor in his disability."

With regard to the answer to the first question, it should be remembered that Brown's counsel also inquired: "Is it in your mind that in order for a condition to be labor disabling that the individual must in fact be totally unable to work?" and Dr. Sills replied, "No. There are degrees of disability." The language that occupationally speaking, Brown was not disabled "until he had to stop working" is consistent with the language used in occupational disease cases which establish the cumulative disease injuries at the point the workman quits work. (See, e.g., *North American Compress & Warehouse Co.* v. *Givens* (Okla. 1968) 445 P.2d 270; *Colonial Ins. Co.* v. *Industrial Acc. Com., supra,* 29 Cal.2d 79, 83; *Argonaut Ins. Co.* v. *Industrial Acc. Com., supra,* 231 Cal.App.2d 111, 119.)

Dr. Sills' distinction between medical physical disability and occupational disability is consistent with cases holding that it is not sufficient just to show preexisting pathology. (*State of Cal.* v. *Industrial Acc. Com., supra,* 135 Cal.App.2d 544, at p. 551.) Permanent disability has been defined to mean " 'any impairment of bodily or mental function which remains after maximum recovery has been attained from the effects of injury, and which causes impairment of earning capacity, impairment of the normal use of a member, or a competitive handicap in the open labor market.' " (*Subsequent Injuries Fund* v. *Industrial Acc. Com., supra,* 226 Cal.App.2d 136, 144.)

As to the question of neuropathy, the court inquired: "The question exactly as I understand it, considering the fact that this patient had neuropathy sometime in 1964 but not on the totally disabled basis, the partially disabled basis, would you consider this a medical disability or an occupational disability or something other than those two?" Dr. Sills replied, "I would consider it primarily a medical disability other than occupational."

Dr. Sills further testified that: he was unable to tell how much of Brown's disability was caused by cotton ginning and how much by his smoking and drinking. The occupational factors contributed to the aggravation or acceleration of whatever process that may have been present, but he could not give a definite answer whether it played a major part. The disability from Brown's drinking and smoking and from his cotton ginning were probably concurrent factors. Asked about conclusion 3 of his report reading: "We must attribute his disability to his work. The smoking and previous infections are contributory but we cannot divide up the responsibility in percentages," he replied, "I not having had a basis upon which to determine his disability there may have been due to the smoking prior to his exposure in industry, I can't tell which element pro-

duced most of the damage." (In this connection, see *McAllister* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 408, 418-419 [71 Cal.Rptr. 697, 445 P.2d 313].)

In *Smith* v. *Workmen's Comp. App. Bd.* (1969) 71 Cal.2d 588, 592 [78 Cal.Rptr. 718, 455 P.2d 822], the court stated: "factual determinations of the board must be upheld if there is substantial evidence in their support and the relevant and considered opinion of one physician, though inconsistent with other medical opinions, may constitute substantial evidence. . . ." (See also *LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d 627, 639.) Here, there was no other relevant contrary medical opinion. Dr. Sills' report and testimony, when considered as a whole, was relevant and considered.

Thus even if it were legally possible to remove from the cumulative injury a component part and use it to establish a prior permanent partial disability, the evidence in this case falls short of making out such a case antedating October 10, 1966. In any event, Brown did not carry his burden of proof.

### Disposition

The decision of the WCAB is affirmed.

Kaus, P. J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied December 23, 1971.