[L. A. No. 29633.   In Bank.   July 2, 1969.]

MARY M. SMITH, Petitioner, v. WORKMEN'S COMPEN-
SATION APPEALS BOARD, COUNTY OF LOS AN-
GELES et al., Respondents.

Lemaire, Mohi, Morales, Dumas & Song and Gary Mohi for Petitioner.

Everett A. Corten, Sheldon M. Ziff, F. G. Loughrey, T. Groezinger, Loton Wells and A. C. Jones for Respondents.

MOSK, J.—Otis S. Smith died at the age of 45 on November 24, 1967, as the result of congestive heart failure. The Workmen's Compensation Appeals Board (hereinafter the board) determined that his injury did not arise out of his employment and that therefore his widow was not entitled to death benefits. She contends in this proceeding that the board erred in its determination because the evidence before it compels the conclusion that Smith's heart disease was aggravated by his work.

From October 16, 1957, until July 15, 1964, Smith was actively employed as a tree laborer. This work required him to operate a chain saw and to lift logs weighing up to 90 pounds. The work was very strenuous and was classified by his employer as "arduous."

In 1962 Smith contracted pneumonia, for which he was hospitalized. At that time he showed no evidence of heart disease. He was admitted to the hospital again on March 5, 1964, at which time the diagnosis was organic heart disease with congestive heart failure and chronic alcoholism. Smith returned to work after his discharge from the hospital and, in early July of 1964, injured a toe while at work. The toe was ultimately amputated, and he was hospitalized for about a month on account of this injury. During this sojourn in the hospital the doctors noted that Smith's heart disease could possibly be attributed to alcoholic myocardiopathy. The term "myocardiopathy" is defined as a disease of the muscle of the heart. Smith did not return to work between his discharge from the hospital on August 10, 1964, and his death three years later. In this interval he was hospitalized a number of times and was under constant care and medication because of his heart condition.

In March 1967 Smith filed an application for benefits, asserting that he had been disabled since July 1964 due to heart disease caused by "continuous stress and strain."

After his death in November of that year Smith's widow applied for death benefits. The matter was heard on April 8, 1968, at which time two physicians testified as to the cause of Smith's death and its relation to his employment.

The referee found that Smith had sustained a compensable injury but the board reversed this determination. It relied in this connection upon the testimony of Dr. Morton Kritzer at the April 8 hearing and upon his reports on April 29, 1966, and May 20, 1967, which, according to the board, amounted to an opinion by Dr. Kritzer "that applicant's cardiac condition was not related to the amputation of his toe and in no way causally connected to his occupation or to the accident sustained by him." While we have no doubt that there was sufficient evidence to sustain the board's conclusion that the injury to Smith's toe and its aftermath were not causally related to his heart disease, we decide that the evidence is insufficient to sustain the determination that Smith's heart disease was "in no way causally connected to his occupation."

Dr. Kritzer's report of April 29, 1966, reviewed Smith's extensive medical history, including his hospital records. It stated that Smith was suffering from severe heart disease, that his course was progressively downhill and his prognosis poor, and that it was not certain that he could perform even totally sedentary work. The report concludes: "This patient's heart disease antedated whatever injury he had to his toe by definitely three to four months. It may have been going on longer than that, but he essentially became symptomatic in March of 1964. . . . His heart disease has absolutely nothing to do with the injury to the toe, and I cannot see where it would in any way be influenced by the injury to the toe. He unfortunately has some form of myocardiopathy, which is enlarging his heart, causing left ventricular hypertrophy, progressive heart failure, and which has a rather poor future prognosis. From the history . . . the diagnosis of alcoholic myocardiopathy is a good one. This, however, is a rather difficult diagnosis to make; it is purely dependent upon the history of alcoholism. The only other conceivable diagnosis is the form of ventricular hypertrophy that is secondary to some form of idiopathic myocarditis; the etiology of this is unknown. Suffice it to say, the patient's intercurrent smashing of his toe had nothing whatsoever to do with the initiation of his heart condition, nor does it have anything to do with its subsequent progression."

The report of May 20, 1967, concludes, ". . . Mr. Smith is suffering from heart disease presumably due to alcoholic disease or ventricular hypertrophy. This has become progressively worse since my last examination of him and is at the present time, I think, almost completely disabling. . . . I fail to see where there is any connection whatsoever between this patient's heart disease and his accident. The heart disease is of a rather peculiar and little understood etiology, progressive at its own rate, has nothing whatsoever to do with the amputation of the toe or its sequelae. It is, therefore, I believe in no way causally connected to his occupation. . . . I do think that this patient certainly is in need of medical care, his future prognosis is really poor because of the underlying heart disease and its progression. . . . Again, I must reiterate, I cannot conceivably think of any way in which this patient's occupational accident in any way could have influenced either his heart or his lung disease."

At the April 8 hearing Dr. Kritzer, called as a witness by the employer's insurance carrier, testified as follows: Smith's death was due to congestive heart failure secondary to myocardiopathy. Where there is myocardial damage the heart breaks down in its function as a pump; the blood backs up into the venous system and heart failure results. Treatment for such a condition includes medication and bed rest. The cause of acute myocardiopathy is usually unknown but there is a form of the disease which is connected with a history of alcoholism. The alcoholic myocardiopathy which was the primary cause of Smith's death was caused by his consumption of alcohol and was not connected with his occupation.

On cross-examination, Dr. Kritzer stated that, although the only direct evidence regarding Smith's alcoholic intake indicated that he consumed only half a pint of liquor a week, this amount was "like poison" to a man suffering from alcoholic myocardiopathy. Once the heart begins to fail as a pump, activity increases its failure. A person who is in heart failure should not perform physically strenuous work because this will aggravate the damage to the heart by placing a greater load on it. Smith was diagnosed as suffering from congestive heart failure in March of 1964 and if he performed strenuous work after that time, such as lifting heavy weights of 40 or 50 pounds, this would have affected his heart.

A doctor called as a witness by Smith's widow testified that in his opinion Smith's heart disease was aggravated by the injury to his toe because his physical activity and therefore

his circulation was circumscribed by the injury, that without evidence that Smith drank a vast amount of alcohol every day, and other information, a diagnosis of alcoholic myocardiopathy was not justified, and that there was a causal rela-tionship between Smith's work and his heart disease.

■ We recognize at the outset these two well-settled principles: (1) factual determinations of the board must be upheld if there is substantial evidence in their support and the relevant and considered opinion of one physician, though inconsistent with other medical opinions, may constitute substantial evidence (*Jones* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 476, 478-479 [67 Cal.Rptr. 544, 439 P.2d 648]; *Standard Rectifier Corp.* v. *Workmen's Comp. App. Bd.* (1966) 65 Cal.2d 287, 292 [54 Cal.Rptr. 100, 419 P.2d 164]; *Fred Gledhill Chevrolet* v. *Industrial Acc. Com.* (1964) 62 Cal.2d 59, 61 [41 Cal.Rptr. 170, 396 P.2d 586]); (2) even though an employee's underlying heart disease was not caused by his employment, his disability or death is compensable if such disease is aggravated or accelerated by his work. (*Fogarty* v. *Department of Industrial Relations* (1928) 206 Cal. 102, 110 [273 P. 791]; *G. L. Eastman Co.* v. *Industrial Acc. Com.* (1921) 186 Cal. 587, 594 [200 P. 17]; see *Lumbermen's Mut. Cas. Co.* v. *Industrial Acc. Com.* (1946) 29 Cal.2d 492, 496 [175 P.2d 823]; 2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed. 1968) § 11.03 [5][e].)

The relevant inquiry, therefore, is whether regardless of the origin of Smith's underlying heart disease his work as a tree laborer aggravated or accelerated the condition. The evidence compels a conclusion that it did. In the reports of April 29, 1966, and May 20, 1967, Dr. Kritzer emphasized that Smith's heart disease was in no way connected with the injury to his toe or its aftermath. The only statement which conceivably could be viewed as relating to the connection between his heart pathology and the conditions under which he worked is contained in the last sentence of the following excerpt from the May 20, 1967, report: "The heart disease is of a rather peculiar and little understood etiology, progressive at its own rate, has nothing whatsoever to do with the amputation of the toe or its sequelae. It is, *therefore,* I believe in no way causally connected to his occupation." (Italics added.) This statement can be interpreted reasonably to mean only that Dr. Kritzer opined because the origin of Smith's heart disease was not clear and it was not related to the toe injury, it was

impossible to conclude that there was a causal connection between the disease and Smith's employment. Such an opinion is of little value in determining industrial causation under the rules set forth above since it is obvious that Dr. Kritzer did not give any consideration to the fundamental question whether the nature of Smith's work aggravated his heart disease. █ As stated in *Zemke* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 798 [69 Cal.Rptr. 88, 441 P.2d 928], ". . .. an expert's opinion which does not rest upon relevant facts or which assumes an incorrect legal theory cannot constitute substantial evidence. . . ."

█ Dr. Kritzer testified on direct examination at the April 8 hearing that Smith's heart disease was not connected with his occupation. However, the record reveals the doctor was unaware that Smith's work was strenuous.[1] When asked on cross-examination if physically strenuous work would aggravate the heart disease of a person who is already in heart failure, he replied in the affirmative. There is no dispute that Smith was diagnosed to be suffering from heart failure in March of 1964, that he returned to work after that time, and that his work required him to lift weights up to 90 pounds. The evidence clearly demonstrates, therefore, that Smith's employment aggravated his heart disease and, under the settled rules set forth above, his disability or death, if caused by the disease, is compensable as a matter of law.

The board contends that Dr. Kritzer's testimony regarding the aggravation of a heart condition caused by strenuous work did not relate to Smith's heart disease but to an abstract discussion of experimental work of another doctor in treating patients with severe heart disease. We are satisfied from the colloquy quoted in the margin that the witness was testifying that strenuous work would adversely affect the heart of any person who was in heart failure, including Smith.[2]

---

[1] When Dr. Kritzer was asked whether he was familiar with the work Smith was required to do, he replied, "Well, he worked in the Parks and Recreation Department and he used to prune trees and tend to shrubs and things like that."

[2] After Dr. Kritzer testified regarding the experiments of a Dr. Burch in treating patients with severe heart disease, the following colloquy ensued on cross-examination:

"Q. You mentioned this man Burch who put people to bed. What type of heart problem was that?

"A. Myocardiopathic intractable heart failure.

"Q. And you said he had a good result with a few with bed rest. What about the bed rest?

"A. He changed a hundred percent mortality to a ninety percent mortality. . . .

Finally, the board contends that even if Smith's heart disease was aggravated by his work in 1964, "there is no showing that it was the proximate cause of his death over three years later." As we have seen, the evidence shows that Smith's death was caused by his heart disease and that the disease was aggravated by his employment. ▮ The mere passage of time between the employment-induced disability and the death of the employee does not break the chain of causation. In *Fogarty* v. *Department of Industrial Relations* (1928) *supra,* 206 Cal. 102, the employee, suffering from a pre-existing heart condition which was aggravated by his work, was disabled for two years prior to his death. The court, in overturning the decision of the board denying death benefits, held that the evidence presented "an unbroken chain of events indicative of the fact that, whatever the condition of the health of the employee had theretofore been, the exposure and exhaustion to which he was subjected precipitated the

"Q. And did any of them die? Was there any study made as to whether or not any of the ninety percent might have died sooner because of the bed rest?

"A. He made the studies—people asked him that and he felt that wasn't the case.

"Q. Then I take it activity is, in your opinion, contra-indicated in this type of heart problem?

"A. Once the heart starts to. fail as a pump you increase its failure by activity. Activity is very good prior to any signs of this failure. In other words, if you have got a heart that's working adequately as a pump with very poor circulation, you try to keep it active to increase the circulation to the heart, but once the heart stops its function or starts to drop is function as a pump, anything that's added to make that pump work harder, such as exercise, is deleterious to it.

"Q. Then, such as physical work after that time would aggravate that condition, hasten the death? A. Right. . . .

"Q. But physically strenuous work with a heart already in heart failure would damage the heart or aggravate that condition, would it not, because a greater load would be placed on the heart?

"A. I think so.

"Q. According to that report [Smith's hospital record] doesn't it state that he [Smith] was admitted to the Kaiser Hospital on or about 3/5/64?

"A. He was, yes.

"Q. And at that time a diagnosis of congestive heart failure was made, was it not?

"A. Oh, yes. . . .

"Q. Would working after March 22 with that underlying diagnosis of congestive heart failure, would that affect the heart?

"A. Strenuous work, yes.

"Q. Or the work of a tree laborer? A. I don't know exactly what a tree laborer does, but if he does real strenuous activity, lifting heavy things over forty, fifty pounds, has to climb up trees or something like that, yes, I think that would affect his heart.

train of symptoms which culminated in his death.'' (206 Cal. at pp. 109-110.)

The decision of the board is annulled.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.