[No. B074383. Second Dist., Div. One. Apr. 21, 1994.]

PAUL S. NASH, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, STATE
DEPARTMENT OF INDUSTRIAL RELATIONS et al., Respondents.

## Counsel

Donald Renetzky an Pauline Nightingale for Petitioner.

Krimen, Klein, Da Silva, Daneri & Bloom and Robert A. La Porta for Respondents.

Opinion

**SPENCER, P. J.**—Applicant, Paul S. Nash, a workers' compensation judge, filed four applications alleging cumulative and specific industrial injuries from May-1972 to May 28, 1987, to his eyes, hearing, head, back, upper and lower extremities, left hip, right shoulder, psyche, and cardiovascular system. The four cases were consolidated for hearing, and independent medical examiners (IME's) were appointed.

On January 30, 1991, after receiving the reports of the IME's, reviewing their depositions and a massive amount of other medical records, and conducting several evidentiary hearings, Workers' Compensation Judge (WCJ) Frank S. Falero found that Judge Nash had not sustained any industrial injury except for a stipulated industrial injury to his back. The Workers' Compensation Appeals Board (Board), after this court issued an alternative writ to compel the Board to render a decision on applicant's petition for reconsideration, filed its opinion and decision after reconsideration on February 17, 1993. The Board amended the WCJ's findings in some respects, but upheld the WCJ's basic determination that the applicant's most serious medical complications were nonindustrial, and thus not compensable.

We granted review and have concluded that the Board properly affirmed the WCJ's determinations for reasons we shall explain. The issues of medical causation and the potential application of the doctrine of res judicata raised by Judge Nash's numerous accidents and resulting applications for workers' compensation were complex, and his medical history long. In summarizing the medical evidence, we have been assisted by the thorough and evenhanded summary contained in the Board's opinion and decision after reconsideration.

### Past Medical and Litigation History

Applicant, born April 21, 1915, is now 78 years old and was employed as a WCJ from May 1972 until his retirement on May 28, 1987, by the State of California Department of Industrial Relations, legally uninsured, whose compensation claims were adjusted by State Compensation Insurance Fund (SCIF). Prior to his employment as a judge, applicant was an attorney for SCIF.

On March 11, 1974, applicant filed an application alleging industrial injury to his head, neck, back, and right knee resulting from an automobile accident on January 27, 1971. The injury occurred in the course of applicant's employment, while applicant was driving a SCIF car. Medical reports

established that applicant had sustained a low back injury and was restricted from heavy work. The case was settled for $12,500, and an order approving the compromise and release issued on April 7, 1975.

On May 19, 1976, applicant filed an application alleging industrial injury to his right major hand, left leg, and vascular system on May 22, 1975. On this occasion, applicant had accidentally struck his right hand and left leg while arising from his desk. His left leg became swollen, and thrombophlebitis was diagnosed at Kaiser when he sought treatment. (Kaiser's records identified the phlebitis as spontaneous, rather than the result of trauma.) Applicant was treated through the end of 1975. In March 1976 applicant experienced further pain in his left leg and also developed pain in his chest. He was hospitalized at Kaiser with what was diagnosed as a pulmonary embolism (obstruction). On August 2, 1976, applicant sustained further alleged injury to his right leg and right major arm and hand. After filing an application, applicant testified at hearing that this injury had occurred when he reached over backward to get a file and fell out of his chair, striking his right leg and arm.

These mishaps in 1975 and 1976 occasioned the four applications for workers' compensation. Applicant's doctor, internist Reuben Merliss, M.D., reported on June 21, 1977, that applicant had problems with varicose veins, but that these had not produced any disability. He asserted that the injury applicant sustained at work on May 22, 1975, had caused the thrombophlebitis in applicant's left leg, which in turn led to the pulmonary embolism, resulting in a substantial pulmonary impairment. Frank Dituri, M.D., reporting for SCIF, opined that applicant's vein problems reflected a nonindustrial cardiovascular condition which had existed prior to applicant's employment. Dr. Dituri did not think that applicant's fall at work in May 1975 had been the precipitating cause of the pulmonary embolism.

The parties selected Morton D. Kritzer, M.D., to serve as agreed medical examiner. Dr. Kritzer identified the May 22, 1975, fall as the precipitating cause of the pulmonary embolism. As a consequence, applicant was rated for both his pulmonary and thrombophlebitic problems. (Applicant was also examined by neurologist Vasilios Lambros, M.D., who reported that he could find no organic basis for the claimed injury to applicant's right hand, and that applicant had made a complete recovery from the August 2, 1976, accident. Dr. Lambros expressed the view that applicant was utilizing his physical complaints for purposeful and useful gain.) Both Dr. Kritzer and Dr. Lambros noted that applicant had smoked cigarettes for a long period of time. The medical reporting concerning applicant also indicates that, after

applicant stopped smoking cigarettes, he engaged in pipe smoking.[1] Dr. Kritzer limited applicant to light work, and declared that future medical treatment for applicant's thrombophlebitic condition would depend on its recurrence or the progress of his cardiovascular disease.

For the injury to his left leg and for pulmonary impairment (case No. 76 VN 58519), applicant was awarded, on March 27, 1979, 68½ percent permanent disability indemnity and future medical treatment. The total awarded was $25,935. On the same date, applicant was awarded 2 percent permanent disability indemnity and future medical treatment for the injury to his right hand and right leg. (Case No. 77 VN 64319.) The total awarded was $420.[2] There were no petitions for reconsideration as the result of these awards.

In a subsequent application, applicant claimed he fell forward as he was coming out of chambers to his hearing room on March 25, 1981, striking his right leg on the edge of the dais, in a room full of witnesses. Ralph Beasom, M.D., confirmed that applicant had sustained an injury to his right calf and head, and sent applicant to cardiovascular surgeon Stuart Hodosh, M.D., in May 1981, after applicant complained of cramps in his right leg. Dr. Beasom had noted intermittent claudication (lameness) of the right calf, which Beasom thought was due to a vascular problem rather than to the contusion of the leg.

Dr. Hodosh diagnosed applicant as having "right superficial femoral occlusion." He noted that applicant had significant varicosity of his veins. He recommended conservative treatment. According to the Board report, "On August 17, 1981, SCIF sent a letter to Dr. Hodosh asking the doctor: 'Please advise if the claudication condition of Mr. Nash's right calf was due to his vascular problem or due to the contusion sustained to his leg on March 25, 1981.' A notation initialed by the doctor appears on the letter as follows: 'Injury made worse existing condition of arterial occlusive disease.' (Exhibit WCAB X-2) A follow-up letter from SCIF dated August 26, 1981 acknowledges receipt of the above notation and states: 'Since the March 25, 1981 injury worsened Mr. Nash's pre-existing arterial occlusive disease, please advise when Mr. Nash will reach his pre-injury status.' The notation on this letter initialed by Dr. Hodosh states: 'I am unable to say but problem will most likely be progressive.' "

---

[1] The record as a whole contains varying accounts from doctors and applicant himself concerning how long applicant smoked, and how much. The estimates ranged from 30 to 50 years, from one-half pack a day to 2 or 3 packs a day, and from 10 to 15 balls of pipe tobacco a day. The date he stopped using nicotine products is also not clear.

[2] This award was made pursuant to Labor Code section 5802, which permits a WCJ to make a nominal permanent disability award after an industrial injury has occurred, even when there is no present evidence of disability but when the potential exists for disability in the future.

Applicant was also seen about this time by an eye doctor, Dr. Dickerson, for problems with his left eye.

On June 20, 1983, applicant was coming off the dais going into his chambers when he fell over a wastepaper basket, hurting his right leg just below the knee. Dr. Hodosh examined applicant on June 27, 1983, and informed SCIF that his diagnosis was "thrombosis right greater saphaneous [*sic*]." On June 28, 1983, Dr. Hodosh excised applicant's greater saphenous vein by performing a right common femoral (groin) thrombectomy. Dr. Hodosh also advised SCIF that the 1983 incident had no relation to the 1981 incident. Dr. Hodosh continued to treat applicant, and by January 9, 1984, was reporting that applicant's condition was good. On July 17, 1984, however, Dr. Hodosh advised SCIF that applicant was continuing to have pain in the right leg, and that applicant was suffering from arterial occlusive disease. Arteriography was scheduled for October 21, 1984.

On February 28, 1985, Dr. Hodosh advised SCIF that applicant had been admitted to Santa Monica Hospital on February 27, 1985, with a diagnosis of aortoiliac and femoral popliteal (knee) occlusive disease, and had undergone aortic reconstruction, aorto-bilateral iliac endarterectomy with Gortex Patch grafts. Dr. Hodosh noted that applicant's present problems constituted aggravation of a "pre-existing asymptomatic condition."

Judge Nash's next injury occurred on July 3, 1986. He testified that the injury occurred at about 3:15 p.m., when he was attempting to discard a document into the wastepaper basket but then realized he needed to retrieve it. He did so in an awkward manner, and experienced an immediate sharp pain in his left hip. Applicant went to Kaiser, and received some heavy medication for pain which radiated from his left hip to his toes. Applicant testified that a few days later, on July 8 or July 9, 1986, while heavily medicated, he was at home walking around barefoot, and nicked his left little toe.

According to the Board account, "[h]e testified that he arose around 2 o'clock in the morning with terrible pain in the toe and immediately went to Kaiser Walk-in. He was seen by Dr. Epstein who told him he needed to see a vascular specialist. Three days later, Dr. Epstein told him he had a gangrenous condition. His attorney called Kaiser and Dr. Nagakawa saw and admitted him whereupon several surgeries were done on his left groin and left little toe, the latter being [partially] amputated. Ten days later he was released but returned two days later for further amputation of the same little toe. Dr. Hodosh was allowed to come to Kaiser and he had the applicant transferred to St. John's Hospital in August of 1986."

There the following diagnosis was made, of: "'1. Digital ischemia of uncertain causes; rule out thromboangiitis obliterans, rule out hyper coagulable state due to lupus inhibitor. 2. Arteriosclerotic cardiovascular disease. 3. Lupus inhibitor. 4. Anemia of chronic disease.'" Gangrene was found in the left third and fourth toes, as well as the fifth, and cyanosis of the distal end of the fingers of the right hand was noted. The gangrenous condition continued to accelerate and he was transferred to Santa Monica Hospital for hyperbaric chamber treatment. It was at this time that a diagnosis of Buerger's disease was made. (Buerger's disease is a circulatory condition affecting young male smokers.) On September 26, 1986, his foot was amputated six inches below the left knee, as were the tips of the right and left little fingers.[3]

In October 1986, applicant was admitted to Northridge Hospital Medical Center for rehabilitation, and was seen by orthopedic surgeon Seymour Gassner, M.D., who was to treat applicant's postamputation and other orthopedic problems. He was released on October 17, 1986, continuing under Dr. Gassner's care. Applicant reported that in September and December 1986, attempting to ambulate on the left prosthesis, he had fallen into his walker, injuring his right arm.

On February 1, 1987, Judge Nash was released to return to work with a restriction from prolonged standing, walking, lifting, and carrying. He still had low back pain, and some pain on the right side due to the falls into his walker. He also developed pain in his left hip, for which Dr. Gassner prescribed cortisone. Judge Nash testified that when he returned to work, he was given a very heavy workload and subjected to harassment by his presiding judge. Judge Nash was supplied with pain medications, and worked until March 13, 1987, when he was put on bed rest at home. He returned to work on April 13, 1987, and worked until the end of May 1987, when he retired as a WCJ.[4]

On February 16, 1988, applicant was admitted to Northridge Hospital with pain in the right foot and toes on walking. The diagnosis was "1. Status post

---

[3]Review of Kaiser records shows that applicant was seen in July 1986 and given medication, and was described as having low back pain radiating to the left ankle, but "no injury." However, on July 25, 1986, Dr. Nagakawa indicated in his notes that applicant had told him he had banged his left foot on hard objects on a number of occasions. Dr. Nagakawa also performed a left femoral popliteal bypass with a six-millimeter Gore-Tex graft on August 6, 1986, after an arteriogram showed stenosis of the left superficial femoral artery. There was also examination of applicant's back and spine, revealing considerable degeneration.

[4]Dr. Gassner reported on December 29, 1987, that applicant was permanent and stationary, and limited to sedentary activities only. It was thought he would continue to have orthopedic limitations, and Dr. Gassner opined that "[Applicant's] left lower extremity amputation problems are felt to be secondary to aggravation of a systemic arteritis type of problem, the aggravation being secondary to his on the job activities." Dr. Gassner was of the opinion that applicant could no longer perform as a judge.

diagnosis of thromboangitis [obliterans]. 2. Buerger's disease. 3. Arterosclerosis obliterans. 4. Status post aorto femoral bypass graft. 5. Status post left femoral popliteal bypass graft. 6. Status post left below knee amputation with severe right foot femoral popliteal obstructive disease. 7. Status post vein stripping on the right leg. 8. Ischemia, Right foot."

An abdominal aortogram with runoff was performed, as well as a right lumbar sympathectomy, right femoral tibial artery bypass and right arm cephalic vein bypass graft. Applicant was discharged on March 19, 1988.

On August 15, 1993, applicant had a heart attack and was hospitalized for 10 days. On September 28, 1988, he was admitted to Kaiser Hospital in Woodland Hills with pain in his right leg. On October 12, 1988, his right lower extremity was amputated below the knee. He left the hospital on November 11, 1988, but was again hospitalized on November 18, 1988, for stomach pain. It became necessary to perform abdominal surgery to repair the effects of some 1985 surgery. He was bedridden until March 1989, and at that time revision of the right stump was undertaken because an incision had failed to heal.

CURRENT MEDICAL REPORTS AND LITIGATION

Applicant filed four workers' compensation applications on January 9, 1987, asserting that there was industrial causation of the injuries he sustained from the 1981 fall at work forward. If industrial causation was found, the cost of applicant's medical treatment, including the amputations, would be borne by applicant's employer. Another consequence of such a finding potentially would be a very substantial award for the home care given by applicant's wife since 1986.

Orthopedic surgeon James K. Styner, M.D., reported for applicant on December 16, 1987, that applicant's falls while attempting to ambulate with the left leg prosthesis had aggravated his back and caused a rotator cuff tear of his right shoulder. He concluded that applicant was precluded from competing in the open labor market. He also recommended that applicant have a psychiatric evaluation because of depression and suicidal tendencies. Dr. Styner stated that "During the course of his employment, the patient had a series of injuries which caused or accelerated primarily, or caused secondarily, a series of problems . . . ."

Internist Jens W. Dimmick, M.D., reported for applicant on March 16, 1988, that "the emotional stresses and strains of [applicant's] job, plus the emotional stresses and strains coming from the pain that he encountered in

[the] job, helped to accelerate his atherosclerosis and that the injury to his toe helped to light up his thromboangiitis obliterans which resulted in the amputation of his left lower extremity as well as the tips of his fingers." Dr. Dimmick thought that applicant's atherosclerosis and thromboangiitis "have reinforced each other and the injury to the toes unfortunately served to light up his thromboangiitis obliterans, which then spread throughout his body, affecting his fingers as well as necessitating further surgery." He determined that applicant was totally disabled.

Dr. Dimmick reported further in 1989 that applicant's heart attack in 1988 had been caused by his atherosclerosis, "a disease of the arteries, regardless of the location in the body, that is accelerated and aggravated by certain environmental factors . . . ."

On April 18, 1988, applicant was examined by psychiatrist Thomas A. Curtis, M.D. Dr. Curtis diagnosed a dysthymic disorder, explaining that this was indicated by applicant's depressed state of mind, that his emotional impairment was pronounced, and that psychotherapy was needed. After the IME in psychiatry, Jay Cohn, M.D., recommended psychotherapy, Dr. Curtis reported on December 29, 1989, that applicant had resumed therapy. He also opined that applicant had needed 24-hour home care from his wife since October 13, 1986, when he was released from the hospital after the amputation of his left leg.

Orthopedic surgeon Richard Masserman, M.D., reported for SCIF on January 8, 1988. He declared that applicant had a long history of progressive peripheral vascular disease, particularly in his legs, noting the diagnosis of probable Buerger's disease or thromboangiitis obliterans. He gave a history of an acute low-back-strain injury on July 3, 1986, the bump of the little left toe, resulting gangrene, and amputation of the left leg. He recommended future medical treatment for the vascular disease, low back, right shoulder, and the left leg stump. Dr. Masserman thought the low back injury related to the July 3, 1986, incident and that apportionment was not indicated. He declared that "[t]he right shoulder and arm symptoms are due to the fall in December of 1986 when his left leg gave way." It was Dr. Masserman's opinion that the finger amputations were due to the underlying peripheral vascular disease, as was the left leg amputation, but that the leg amputation was "triggered and hastened by the trauma to the left little toe resulting in gangrene of the foot following the incident in July of 1986." Dr. Masserman attributed applicant's right leg symptoms to "the combined effects of the peripheral vascular disease and post contusion injuries in March 1981, June 1983 and February 1985 by history." He further concluded that applicant was limited to sedentary activities.

Internist Edward J. O'Neill reported for SCIF on July 15, 1987, that applicant had two types of vascular disease, i.e., peripheral vascular venous disease with prior varicose vein surgery and thrombophlebitis with pulmonary embolus, and peripheral vascular arterial disease requiring aortoiliac and femoropopliteal reconstruction surgery.

He said he accepted as fact that applicant had had traumatic injury to his left toe, which had led to the amputation of the left leg. He stated that "[o]ne can expect that the incident of July 1986 'lit up' the condition leading to the requirement for amputation [of the left leg]. . . . The amputation of the fingers is non-occupationally related." However, Dr. O'Neill deemed the hyperbaric treatment, since it was undertaken for the left toes as well as applicant's fingers, occupationally related. On June 10, 1988, Dr. O'Neill reported further that the right leg problems were not occupationally related, and that he did not accept the hypothesis that applicant's struggle with his left leg prosthesis had caused the right leg injury and ultimate amputation, nor was the right leg problem occupationally related on any other theory.

Dr. O'Neill reported again on October 20, 1989, that while the left leg amputation was industrially related, the right leg amputation was not. He denied that peripherovascular arteriosclerotic disease was a stress-related condition. He stated that while there was no question in his mind that applicant would have ultimately faced amputation of his legs without occupational exposure, he could not say when that would have occurred in the absence of the trauma to the left leg. Dr. O'Neill found applicant totally and permanently disabled, and apportioned one-third of his heart problem to industrial stress and strain.

Psychiatrist Robert Feldstein reported for SCIF on May 16, 1988. He found early dementia caused by the progression of the peripheral vascular disease. He described applicant's depression concerning the treatment he received during his last months in the workplace as "retrospective" and declared that applicant's "mental state would exist as it presents today absent any industrial factor associated with work at the WCAB."

During the pendency of this litigation, the WCJ asked the medical bureau to appoint IME's in this case. Michael Roback, M.D., was appointed in orthopedics; Jay Cohn, M.D., in psychiatry; and William B. Cohen, M.D., in cardiovascular surgery.

Orthopedic surgeon Michael D. Roback, M.D., examined applicant and reported on August 16, 1989. Dr. Roback identified applicant's neck, spine, and right shoulder as the areas of applicant's orthopedic disabilities, attributable to the accident at work on July 3, 1986, the subsequent toe injury at

home, and the December 1986 fall at home after the amputation of applicant's left leg. Dr. Roback also concluded that the right leg symptoms and disability were the result of the series of industrial accidents that occurred from 1981 forward and the December 1986, fall, while the left leg symptoms and disability stemmed from the July 3, 1986, and December 1986 accidents.

Dr. Roback thought that applicant's ability to work was severely limited, subject as it was to the conditions and limitations necessitated by his orthopedic problems, his vascular condition, and the amputations of his lower limbs. He thought there was a need for daytime attendant care and future medical treatment.

Dr. Roback was deposed on December 6, 1989. He stated he did not have enough information to indicate when home care became necessary for applicant. Dr. Roback was closely questioned on his qualifications to render an opinion on the industrial nature of applicant's disability caused by his vascular condition. He stated he was qualified to render such an opinion on causation, but had not read the report of the IME in cardiovascular medicine, Dr. William Cohen.

On May 26, 1989, the cardiovascular surgeon, Dr. William Cohen, had reported concerning applicant's condition. He described the course of the treatment of the gangrene in applicant's left foot and fingers, noting that there was evidence of a lupus anti-coagulent inhibitor and no evidence of "an inflammatory process."

With respect to causation, Dr. Cohen stated: "It is agreed that [applicant] suffered from arteriosclerotic occlusive disease of the large, cognate vessels. There is some disagreement regarding the nature of the distal occlusion he had in his left foot. I feel that Judge Nash had ischemia of his distal left foot secondary to occlusion of the small vessels by tiny thrombi or atheroemboli. This rendered his toes vulnerable to trauma, and entrance of bacteria through a break in the skin. I personally do not favor the diagnosis of Buerger's disease since this problem occurs in young men between the ages of 20 and 40, who are actively smoking at least 20 cigarettes per day. Furthermore, most pathologist[s] feel that an inflammatory picture within the small vessels and even the small veins is characteristic of the process. Distal occlusion can occur from emboli generated from a proximal occlusive plaque, or from previous surgery. At the time the fingers were involved, the situation was more complex, including possible infection of the Goretex graft and discovery of the lupus inhibitor.

"I believe there are two essential questions here. Firstly, was the patient's work-related injury on July 3rd indirectly contributory to onset of the toe

gangrene? Secondly, if it was, would Judge Nash have suffered the same problem soon thereafter from the natural course of his disease, even if the accident had not occurred? If we accept the story of the job-related injury, Tylenol # 4 containing 60 mg. of codeine can indeed make one less aware of one's surroundings, and would make inadvertent injury [as] to the toe more likely. It may be useful to draw parallels between Judge Nash's left foot problem and the diabetic foot. In both situations, minor trauma to the foot can lead to gangrene and limb loss. Diabetics who can strictly adhere to their foot care instructions can sometimes postpone gangrenous complications for years. Therefore it is not accurate to say that Judge Nash would have lost his leg in a shorter period of time whether or not the foot injury occurred in July of 1986.

"The issue of the effect of stress on the progress of his atherosclerosis was brought up by Dr. Dimmick and Dr. O'Neill. Stress is considered a minor-variable factor in the progress of atherosclerosis, as opposed to hypertension and hypercholesterolemia which are major factors.

"I believe the applicant's right leg amputation was a product of the natural course of his arteriosclerosis obliterans. On the left, however, the trauma to the 5th toe was more likely to occur while he was taking large amounts of codeine for his work-related injury. Therefore, the left leg amputation should be considered a consequence of the July 1986 injury he sustained."

Dr. Cohen was deposed on four occasions, and was extensively and aggressively cross-examined on his conclusions. His review of applicant's medical history had led him to conclude that the condition which had occasioned the findings and award in 1979 was phlebitis, i.e., a venous condition, and that it had been resolved by treatment. He stated that applicant's real difficulty, for which he was treated by Dr. Hodosh after 1981, was nonindustrial occlusive artery disease. Dr. Cohen explained that "[t]here are two sets of vessels in the leg which are quite different. One are the veins and the other are the arteries. The arteries bring blood into the legs, and the veins drain blood from the leg and back to the heart. [¶] Now, you can have venous disease which can be an obstruction of the veins or a functional disability of the valves in the veins so they were not working properly, and the net effect is that blood doesn't come briskly from the leg back to the heart. [¶] So you get backup of blood in the leg and swelling and ulceration. That's venous disease. [¶] With arterial disease, he gets blockage of vessels that bring blood into the leg." The cardiovascular IME emphasized that applicant's history showed that his problems with phlebitis, i.e., venous disease, had been asymptomatic after the findings and award of 1979, and that review of applicant's medical records after 1979 failed to disclose any further evidence of phlebitic swelling or inflammation.

Dr. Cohen stated that, from 1981 on, applicant was primarily treated for arteriosclerosis. He rejected the notion that the soft-tissue injuries which were assertedly the result of applicant's series of work-related accidents after that date either aggravated or caused applicant's atherosclerosis in either leg. At one point, Dr. Cohen opined that "I don't think that minor traumas usually cause that kind of thing. People are always bumping themselves and falling down. But this isn't the history that I get from most patients who have arteriosclerosis." Dr. Cohen stated that a "soft-tissue injury is usually a self-limited process. It can make a condition worse if, one, it results in a cut, deep vein thrombosis. [¶] It can make it worse if it leads to a nonhealing break in the skin, an ulcer, which requires arterial reconstruction surgery." He maintained this position despite the fact that the treating physician, Dr. Hodosh, had expressed the view that Judge Nash's accidents had aggravated applicant's underlying arteriosclerotic condition.

With respect to applicant's arteriosclerosis, Dr. Cohen was questioned by defense counsel about the impact of applicant's smoking. Dr. Cohen had rejected the diagnosis of Buerger's disease (a circulatory disease prevalent among young male smokers) because he thought it would have surfaced much earlier in applicant's life. However, he testified that "Smoking has a tremendous negative effect on people who have arteriosclerosis . . . there is enough evidence now that chronic smoking will accelerate the progression of arteriosclerosis . . . [a history] of his smoking cigarettes for many years and then going to a pipe, this would be poison for a man with that kind of arteriosclerosis. . . ."

Dr. Cohen was deposed at length on his conclusion that the left leg injury and amputation were compensable. Dr. Cohen had relied on applicant's account of injury in reaching that conclusion. He theorized that a cut in the toe had become infected, accelerating the gangrene process. Inquiry was directed to the significance of applicant's cutting his toe at home in July 1986, and the relationship of that alleged event to the left leg amputation. Dr. Cohen conceded that "if [applicant] just stubbed his toe at home then it wouldn't be a work-related injury. . . ." It developed that Judge Nash had told Dr. Cohen at his patient interview that he had cut his left fifth toe by stepping on some glass. Defense counsel referred Dr. Cohen to the Kaiser report which declared that applicant had banged his toes against hard objects. Dr. Cohen observed that "It would certainly cast doubt on the story of the glass." He then reiterated, however, that either a cut or a bump could have caused the injury.

There was a discussion of gangrene, which Dr. Cohen defined as "[t]issue death secondary to poor circulation." Moist gangrene is infected while dry

gangrene is not. The records at St. John's, about which Dr. Cohen was questioned, indicated that one doctor, Chaong Lai, M.D., who examined applicant while gangrene was developing and prior to the amputation of his left leg, described applicant's gangrene as dry rather than moist, i.e., infected. Another medical report from St. John's declared that prior to the amputation of the left leg, there was no evidence of inflammation in applicant's gangrenous foot. Asked how it happened that applicant had developed gangrene in his fingers at the same time he had developed gangrene in his left foot, if the foot gangrene had been caused by trauma to the toe, Dr. Cohen did not offer any specific explanation. He did declare that if applicant had developed a pregangrenous condition generally due to ischemia (lack of circulation), "[a] cutting would be more likely to cause an amputation than stubbing of a toe." He was questioned about the possibility that applicant's toes had not actually been cut. He responded that if that were so, it would be less likely that applicant's left leg amputation was work-related.

Later, Dr. Cohen testified that "For someone to come in with gangrenous changes of the foot and the fingers at the same time, it almost bespeaks a medical problem a medical, underlying medical condition rather than arteriosclerosis." Dr. Cohen was shown Kaiser records of applicant's examination after the left toe problem developed in July 1986, which indicated no skin opening at all. Dr. Cohen was shown records from St. John's that reported that applicant had digital ischemia of "uncertain cause; rule out thromboangiitis obliterans, rule out hypercoagulable state due to lupus inhibitor." Dr. Cohen then stated that applicant's condition was not completely understood, but concluded that "[t]he picture . . . doesn't seem to be the result of any trauma of—trauma to the feet. I agree. It seems that something else is going on, something affecting his entire body."

The IME in psychiatry, Jay B. Cohn, M.D., reported on July 6, 1989, that applicant had an adjustment disorder with mixed anxiety and severe depression, secondary to nine hospitalizations, amputation of the left leg, and Buerger's disease with a back injury. He found both the subjective and objective factors severe. He identified the July 3, 1986, back injury as the precipitating cause, and termed the psychiatric disability industrial. Dr. Cohn was deposed on three occasions. He declared that applicant's depression began in October 1986, after his left leg amputation. It developed that Dr. Cohn had not conducted any systemic review of applicant's medical records prior to being deposed.

*The WCJ's Findings and Decision*

On January 30, 1991, the WCJ issued his findings and award, determining that with the exception of the back injury, to which the employer had

stipulated, applicant had not sustained industrial injury as alleged in his four 1987 applications. Applicant was allowed medical-legal costs and reimbursement for certain other medical costs.

The WCJ's opinion on decision was 104 pages long, consisting primarily of excerpts from the deposition testimony of the IME's. While acknowledging that the parties had stipulated to an industrial back injury as the result of the July 3, 1986, incident, the WCJ determined there was no permanent disability above the 68½ percent level which entitled applicant to a further award. The WCJ relied on the orthopedic IME's assessment that none of applicant's normal work activities had contributed to his back injury and that there was no cumulative trauma to his back.

With respect to the cardiovascular claims, the WCJ declared that "[a] careful reading of the composite medical evidence consisting of medical reports, records, depositions and the testimony of the applicant and all witnesses at the trial results in the inescapable conclusion that applicant did not sustain an industrial assault to his vascular system which in turn led to his bilateral leg amputation. The Trier of Fact also finds that applicant did not suffer a cut on his left toe in face of contradictory historical notations by the real-time medical examiners and conceded to by the deposed Independent Medical Examiner in Vascular Systems—Dr. William B. Cohen."

Applicant petitioned for reconsideration, contending that the WCJ's findings were not supported by substantial evidence, that the WCJ had abused his discretion by referring this matter to IME's, that the findings on applicant's orthopedic injury claims were "contrary to all the medical evidence," that since applicant's vascular condition had already been determined to be industrial in the 1979 cases, the doctrine of res judicata applied, and that the cardiovascular IME's' testimony was fatally ambiguous.

In his report and recommendation on the petition for reconsideration, the WCJ reiterated his findings and declared, further that he "did not believe the testimony of the applicant and on reading the substantial compositive [*sic*] of evidence in this trial arrived at his conclusion that applicant did not sustain injury arising out of and occurring in the course of employment, nor resulted in any additional orthopedic factors of disability in the cases-in-chief." The WCJ commented that no "percipient witness" had testified concerning any of the incidents described by applicant. The WCJ stated that "[t]he issue of credibility as to all witnesses, lay and medical, lies solely in him." He further declared that the cases "present primarily a medical question, and therefore the most important and most credible witnesses are the medical reports themselves."

*The Board's Decision*

The Board did not issue its opinion in this case until February 17, 1993, nearly two years after the WCJ had issued his recommendation. In upholding the basic determination of the WCJ that applicant had not suffered industrial injury, the Board found the opinion of Dr. Cohen, the IME in cardiovascular medicine, to be "most persuasive" in determining that the right leg injury was clearly nonindustrial and the nature of the left leg injury was uncertain. The Board gave great weight to the WCJ's finding that the applicant was not credible concerning the circumstances of the July 3, 1986, injury. The Board noted that the opinion of one physician can constitute substantial evidence. The Board rejected applicant's argument that the 1979 findings and awards of further medical treatment effectively encompassed applicant's post-1981 circulatory problems, and rejected claims of orthopedic and psychic injury. The Board returned the case to the WCJ "for further development of the record on whether or not there was any injury to the eyes or residuals therefrom as a result of [the March 25, 1981] injury."

DISCUSSION

*Industrial Causation*

Labor Code section 3600, subdivision (a), provides for employer liability to injured employees "for any injury . . . arising out of and in the course of the employment." Subdivision (a)(3) provides for liability "[w]here the injury is proximately caused by the employment, either with or without negligence." The decisional law has equated "arising out of and in the course of employment" with the required proximate cause between the injury and employment. (See 1 Hanna, Cal. Law of Employee Injuries & Workers' Compensation (rev. 2d ed. 1993) Injury and Employment, § 4.02[2], p. 4-17.) The statutory proximate cause language has been held to be less restrictive than that used in tort law, because of the statutory policy set forth in the Labor Code favoring awards of employee benefits. In general, for the purposes of the causation requirement in workers' compensation, it is sufficient if the connection between work and the injury be a contributing cause of the injury (*Maher* v. *Workers' Comp. Appeals Bd.* (1983) 33 Cal.3d 729, 734, fn. 3 [190 Cal.Rptr. 904, 661 P.2d 1058]), and causation is interpreted in the "broadest possible manner." (1 Hanna, *op. cit. supra*, § 402[2], p. 4-18.)[5]

The term "proximate cause" has been subject to varying definitions, including some imposed by law, but one aspect of "proximate cause" is

---

[5]Recent revisions in the statutory law have changed this in some situations, e.g., where there are allegations of psychic injury.

"cause in fact." One example of cause in fact is the logical conclusion that one event has given rise to another, and that "but for" the first event, the second would not have occurred. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 968, p. 358.) In workers' compensation law, whether the employment contributed in such a way to the employee's injury that "but for" the employment the injury would not have been sustained may be a central issue, as it was here.

In the case at bench, it was undisputed that applicant had a nonindustrial, underlying condition which did not arise out of his employment. Applicant's major theory of recovery was based on the principle that an employer takes an employee as the employer finds him, and that if an underlying condition is "lit up" by events causally connected to the workplace, any resulting disability is compensable without apportionment. (See, e.g., *Ballard* v. *Workmen's Comp. App. Bd.* (1971) 3 Cal.3d 832, 837 [92 Cal.Rptr. 1, 478 P.2d 937].) ■ Applicant sought to establish a series of causal connections, particularly between the work-related incident of July 3, 1986, the toe injury at home a few days later, the onset of gangrene, the amputation of the left leg, and the resultant injuries to the remaining right leg, from which the trier of fact could be persuaded that these connected events flowed from the workplace, and caused his resultant disability. Applicant had the burden of proving industrial causation by a "reasonable probability," rather than as a scientific certainty. (*McAllister* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 408, 413 [71 Cal.Rptr. 697, 445 P.2d 313].)

The WCJ, as the trier of fact, specifically determined that applicant was not credible, particularly with regard to the July 3, 1986, incident and the alleged following occurrence, the injury at home to applicant's toe. No reason has been presented for second-guessing this assessment of credibility, to which the Board properly deferred. (*Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 318-319 [90 Cal.Rptr. 355, 475 P.2d 451].) This factual determination effectively derailed applicant's causation theory. There was also substantial evidence contained in the reports and depositions of the IMEs supporting the WCJ's rejection of any medical causal connection between applicant's injuries from 1981 forward, whether specific or cumulative, and his resultant disability. It has long been established that the relevant and considered opinion of one physician, arrived at after adequate examination and investigation, may constitute substantial evidence in support of a factual determination by a WCJ or the Board, even when it conflicts with other medical opinion. (*Smith* v. *Workmen's Comp. App. Bd.* (1969) 71 Cal.2d 588, 592 [78 Cal.Rptr. 718, 455 P.2d 822].) The fact that Dr. Cohen changed his mind about the industrial nature of applicant's left leg injury while being deposed did not render his opinions ambiguous and unworthy of

belief; it merely demonstrated that the search for truth is sometimes enhanced by skillful cross-examination. The medical reporting, particularly from St. John's, cast considerable doubt on the nature of any injury to applicant's left toe as a precipitating cause of the disastrous medical consequences which followed.

*Res Judicata*

In both the petition for reconsideration and the petition for writ of review in this court, applicant has raised the question of whether the doctrine of res judicata should apply in determining his entitlement to the medical treatment which has been provided for his legs, and which may be necessary in the future. Applicant has relied on the findings and awards made in 1979 which determined, respectively, that he was 68½ percent and 2 percent permanently disabled from industrial injuries to his legs, and which included an award of further medical treatment for both of his legs.

He has also relied on the holding of *Granado* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 399, 405-406 [71 Cal.Rptr. 678, 445 P.2d 294], that the medical treatment to which an injured worker is entitled cannot be apportioned, where there is any industrial component of the worker's disability. There is no question that the medical costs of treating applicant's injuries have been extremely high. The record does not tell us how high, but a very substantial amount of care has been provided by applicant's employer.

Labor Code section 4600 provides in pertinent part that "[m]edical . . . treatment . . . which is reasonably required to cure or relieve from the effects of the [industrial] injury shall be provided by the employer. . . ." One of the benefits to which a permanently injured worker may be entitled is an award of future medical treatment.

Hanna has observed that "[t]here is no statutory limitation on the value or duration of treatment an employer must provide to cure or relieve the effects of an employee's industrial injury, except that the treatment must be reasonable. Thus, medical treatment is not necessarily limited to periods of disability." (1 Hanna, Cal. Law of Employee Injuries & Workers' Compensation, *op. cit. supra,* Medical and Hospital Treatment, § 5.03[4], p. 5-20, fns. omitted; also see *Braewood Convalescent Hospital* v. *Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 166 [193 Cal.Rptr. 157, 666 P.2d 14].)

The 1979 findings and awards, providing for "further medical treatment" for applicant's legs, were not contested and became final judgments. It has been held that the doctrines of res judicata and collateral estoppel are

applicable to workers' compensation findings, awards, orders, and judgments. (*Azadigian* v. *Workers' Comp. Appeals Bd.* (1992) 7 Cal.App.4th 372, 374 [8 Cal.Rptr.2d 643].) The doctrine of res judicata bars relitigation of a cause of action "that has been finally determined by a court of competent jurisdiction" (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 810-811 [122 P.2d 892]), and has no application in the instant case, because the 1979 cases and the 1987 cases involved different injuries.

■ It is the doctrine of collateral estoppel (issue preclusion rather than cause of action preclusion) with which we are concerned here, i.e., applicant's entitlement to medical care. Application of the collateral estoppel doctrine may bar relitigation of a particular issue, when there has been a prior adjudication of the issue in another action, but it is utilized more flexibly than is the doctrine of res judicata. It has been said that collateral estoppel is based on equitable principles, and that the issue in question must have been sufficiently litigated in the prior forum to produce a firm and conclusive resolution. (*Sandoval* v. *Superior Court* (1983) 140 Cal.App.3d 932, 936 [190 Cal.Rptr. 29]; Rest.2d Judgments, § 13, com. a, p. 132.)

A compelling argument can be made that awards of future medical care in workers' compensation cases are never sufficiently "firm and conclusive" to bar relitigation of entitlement of medical care at some future time, given the ever changing medical circumstances surrounding the care needed by an injured worker. That argument need not be resolved here, however. The fact is that the issue determined in 1979 was a different issue than that presented by the most recent litigation, despite applicant's status as an injured worker with a substantial percentage of permanent disability in the same body parts. The 1979 awards established applicant's entitlement to treatment of leg disabilities directly attributable to venous complications, but no more.

The medical evidence in the case at bench, particularly that adduced from the report and deposition of the IME in cardiovascular medicine, Dr. William Cohen, persuasively established that applicant's more recent injuries and resultant disability were distinct from those of 1979, because they stemmed from nonindustrial arteriosclerosis rather than the venous problems determined in the earlier litigation to be industrially related.

Nor does the holding of *Granado* dictate otherwise. *Granado* comes into play precluding apportionment of medical care when it is impossible to separate a nonindustrial and industrial need for treatment, rendering the employer liable for the treatment of a nonindustrial condition during the course of treatment of the industrial one. (See, e.g., *Fisk* v. *Workers' Comp. Appeals Bd.* (1993) 20 Cal.App.4th 1078, 1086 [25 Cal.Rptr.2d 174].)

*Granado* also states, however, that "[m]edical treatment unrelated to the industrial injury need not be furnished by the employer." (*Granado* v. *Workmen's Comp. App. Bd., supra,* 69 Cal.2d at p. 406.) Since there was no determination in the case at bench that applicant's treatment for arteriosclerosis was inextricably related to treatment of his venous problems, but rather the opposite was established, applicant's contention that he was at all times after 1979 entitled to employer-funded medical treatment for any disabling condition of his legs fails.

## DISPOSITION

Respondent Workers' Compensation Appeals Board's February 17, 1993, order amending certain findings of the workers' compensation judge, remanding for further proceedings on the allegation of industrially caused eye injury, and denying reconsideration is affirmed.

Vogel (Miriam A.), J., and Masterson, J., concurred.

Petitioner's application for review by the Supreme Court was denied July 13, 1994.